1

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**

7                    **EASTERN DISTRICT OF CALIFORNIA**

8

9    CORONADO                                    Case No. 1:22-cv-00677-JLT-BAM

10                          Plaintiff,           ORDER GRANTING DEFENDANTS'
                       v.                        MOTIONS TO DISMISS WITH LEAVE TO
11                                               AMEND
     CITY OF FRESNO, et al.,
12                                               (Doc. 18)
                          Defendants.
13

14          Anthony Coronado is a resident of Fresno, California. He brings this action against the

15   City of Fresno ("City"), Chief of the Fresno Police Department ("FPD") Chief Andy Hall, FPD

16   Officers David Dechow, Mark Bishop, Gregory Nichols, and Caylee Graves ("Defendant

17   Officers"), as well as unnamed City employees, alleging violations of his personal rights

18   guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution in

19   connection with a police shooting. (Doc. 16.) Defendants moved to dismiss second and third

20   causes of action, as well as the first cause of action with respect to Chief Hall. (Doc. 18.) The

21   matter is fully briefed and ripe for review. (Pl.'s Opp'n, Doc. 24; Defs.' Reply, Doc. 25.) The

22   Court took the matter under submission without oral argument. (Doc. 26). For the reasons set

23   forth below, the Court **GRANTS IN PART** Defendant's motion to dismiss.

24                          **I.    INTRODUCTION**

25      **A. Background[1]**

26          On the night of June 8, 2020,[2] Plaintiff Anthony Coronado was on "a bike ride around the

27   ───────────────────────
     [1] For purposes of this background section, the Court assumes the truth of the factual allegations in the FAC.

28   [2] The FAC indicates that the events at issue began on the evening of June 9, but when read in context, including

                                              1

1   neighborhood to find recyclables, as he collected and handed in these materials as a means of

2   making money." (Doc. 16 at ¶ 12.) "While at or around the intersection of N. Blackstone Avenue

3   and E. Barstow Avenue in Fresno, California," Plaintiff believed he was being followed by a

4   pickup truck that made him "feel uncomfortable and unsafe." (*Id.* at ¶ 13.) Plaintiff then called his

5   sister Alma Coronado "to come pick him up at their usual rendezvous spot of Food Maxx near N.

6   Blackstone Avenue and E. Barstow Avenue." (*Id.*)

7         Plaintiff was "riding his bike around midnight when[] . . . Officer Tuan Tran,"

8   "responding to a report about a man allegedly brandishing a gun at motorists," pulled up to

9   Plaintiff, "got out of his vehicle, unholstered his weapon, and pointed his gun" at Plaintiff. (Doc.

10  16 at ¶ 14.) "Officer Tran commanded Plaintiff to 'drop his weapon,'" even though Plaintiff "did

11  not have any type of weapon in his possession." (*Id.*) "He simply had his bike, his mother's cell

12  phone, a bottle opener, and a pair of pliers he carried in case his bike needed repairs while he was

13  riding it." (*Id.*)

14        Plaintiff "gripped his bike with his left hand while holding his right hand up in the air

15  above his head" with his cell phone. (Doc. 16 at ¶ 15.) Plaintiff "attempted to communicate to

16  Officer Tran that he did not have a gun, that the object was indeed a cellphone, and that he posed

17  no threat." (*Id.* at ¶ 16.) "Officer Tran returned to his vehicle and continued to follow Plaintiff

18  who walked very slowly." (*Id.* at ¶ 17.) Plaintiff did not run, ride his bike, or otherwise evade or

19  "flee Officer Tran's immediate vicinity." (*Id.*) Plaintiff was then "intercepted by two police

20  vehicles, which were traveling toward him and blocked his path." (Doc. 16 at ¶ 18.) Officers

21  Dechow and Bishop, who were driving those vehicles, "both used their PA systems to shout

22  commands at Plaintiff simultaneously." (*Id.* at ¶ 19.)

23        Confused by the different commands shouted by the two officers, he tried to communicate

24  to the officers that he had no weapon in his possession "by putting his right hand up in the air—

25  again attempting to signal his compliance and surrender—and showing them that he was holding

26  a mere cellphone, not a weapon." (Doc. 16 at ¶¶ 19–20.) Officers Dechow and Bishop then

27

28  allegations related to events at a hospital the following day, which is also indicated to be June 9, the Court infers that
    the events began on June 8.

                                        2

1    "exited their respective vehicles and drew their weapons." (*Id.* at ¶ 22.) "Without any verbal

2    warning," the officers, together, fired 7 rounds at Plaintiff, hitting him multiple times. (*Id.* at

3    ¶¶ 23–24.) Even after noticing that Plaintiff had no firearm on him, the officers still proceeded to

4    handcuff Plaintiff, while he bled on the ground, and without reading him his *Miranda* rights. (*Id.*

5    at ¶ 25.) Officers-on-scene "did not administer first aid to Plaintiff while waiting for an

6    ambulance to arrive." (*Id.* at ¶ 28.)

7         At the E.R. trauma room, Plaintiff "was handcuffed to the hospital bed rail by his left

8    wrist, despite not having been charged with any crime and being severely injured." (Doc. 16 at

9    ¶ 29.) At least one officer questioned Plaintiff "while he was in a state of extreme pain and

10    disorientation, and chained to the hospital bed, without ever reading him his rights or explaining

11    to him why he was being detained." (*Id.*) Around 1:00 p.m. on June 9, 2020, approximately 12

12    hours since he arrived at the hospital, Detective Raul Diaz "finally read Mr. Coronado his

13    Miranda rights, but made it clear that he was not charging Plaintiff with any crime, though

14    [Plaintiff] would have to remain handcuffed to the hospital bed and was not free to leave." (Doc.

15    16 at ¶ 30.)

16         Plaintiff was detained at the hospital until around 5:30 p.m. the following day," when he

17    was discharged from the hospital and "was immediately transported to the Fresno Police

18    Department Headquarters. There, he was cited with the misdemeanor offense of violating

19    California Penal Code § 148(a)(1)—Obstructing and Delaying a Police Officer, namely Officer

20    Tran. After issuing the citation, Det. Diaz finally told Plaintiff he was free to leave." (Doc. 16 at

21    ¶ 31.) Plaintiff "has been consistently in and out of the hospital," even after his release, for

22    multiple surgeries. (Doc. 16 at ¶ 36.) He has yet to fully recover from his injuries and continues to

23    "experience[] immense pain, illness, and weakness." (*Id.*)

24                              **II.    LEGAL STANDARD**

25         Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move

26    to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P.

27    12(b)(6). To survive a motion to dismiss, the complaint "must contain sufficient factual matter,

28    accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

1    U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This

2    plausibility inquiry is a "context-specific task that requires [this Court] to draw on its judicial

3    experience and common sense," *Iqbal*, 556 U.S. at 679, and "'draw all reasonable inferences in

4    favor of the nonmoving party[,]'" *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022) (quoting

5    *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir.

6    2014)). "Conclusory allegations and unreasonable inferences," however, "do not provide [] a

7    basis" for determining a plaintiff has plausibly stated a claim for relief. *Coronavirus Reporter v.*

8    *Apple, Inc.*, 85 F.4th 948, 954 (9th Cir. 2023) (citation omitted).

9                                    **III.    DISCUSSION**

10       **A. First Cause of Action: Excessive Force**

11           The Fourth Amendment prohibits police officers from using an objectively unreasonable

12   amount of force to effectuate an arrest or seizure. Plaintiff alleges under the first cause of action

13   that Officers Dechow, Bishop, Nichols, and Graves used unreasonable force against him,

14   including but not limited to shooting him seven times and keeping him handcuffed while he was

15   severely injured. (Doc. 16 at ¶¶ 40–41.) Defendants' motion to dismiss does not address contest

16   this part of the first cause of action. What is being contested, however, is Plaintiff's allegation that

17   Chief Hall "is liable in his individual capacity as a supervisor as he condoned, ratified, and

18   encouraged the use of force by approving the officers' behavior and failing to discipline his

19   officers." (*Id*. at ¶ 43.) Defendants argue that the first cause of action must be dismissed with

20   respect to Chief Hall. (Doc. 18 at 8–11.)

21           Although a municipal supervisor like Chief Hall may not be held liable for the

22   unconstitutional conduct of his subordinates under a theory of respondeat superior under 42

23   U.S.C. § 1983, he "can be liable in his individual capacity for his own culpable action or inaction

24   in the training, supervision, or control of his subordinates; for his acquiescence in the

25   constitutional deprivation; or for conduct that showed a reckless or callous indifference to the

26   rights of others." *Starr v. Baca*, 652 F.3d 1202, 1208 (9th Cir. 2011) (quoting *Watkins v. City of*

27   *Oakland, Cal.*, 145 F.3d 1087, 1093 (9th Cir. 1998)). To impose liability in this context, the

28   plaintiff "must still allege sufficient facts to plausibly establish the defendant's 'knowledge of'

                                            4

1   and 'acquiescence in' the unconstitutional conduct of his subordinates." *Hydrick v. Hunter*, 669

2   F.3d 937, 942 (9th Cir. 2012) (quoting *Starr*, 652 F.3d at 1206–07)). Defendants contend that

3   "Plaintiff fails to allege any specific facts to support his conclusory allegations concerning Chief

4   Hall's conduct." (Doc. 18 at 10.) Plaintiff offers many arguments in his brief in opposition, none

5   of which this Court finds persuasive.

6          First, as Defendants point out, (Doc. 25 at 4), Plaintiff introduces many new statistics that

7   are not in the FAC, (Doc. 24 at 11), which cannot be considered by this Court on a motion to

8   dismiss. Nor do those statistics meaningfully advance Plaintiff's case. For instance, Plaintiff talks

9   about how the FPD had more shootings between 2016 and 2021 than 68% of other law

10  enforcement agencies. The significance of that number, however, is not clear to this Court.

11  Similarly, Plaintiff points out that "[a]lmost half of guns 'perceived' guns were never found[,]"[3]

12  but without explaining the significance of this fact.

13         The FAC relies only on one statistic: that "only 18%" of complaints of police misconduct

14  "were ruled in favor of civilians." (Doc. 24 at 11 (citing Doc. 16 at ¶ 33).) Plaintiff offers no

15  explanation as to how this bears on the liability of Hall, other than to argue that it "indicat[es] that

16  there is a lack of accountability and punishment for use of excessive force by officers." (Doc. 16

17  at ¶ 33.) "Statistics of unsustained complaints of excessive force and other police misconduct,

18  without any evidence that those complaints had merit, does not suffice to establish [supervisory]

19  liability under § 1983." *Cf. Hocking v. City of Roseville*, No. Civ. S-06-0316 RRB EFB, 2008 WL

20  1808250, at *5 (E.D. Cal. Apr. 22, 2008) (holding that unexplained statistics do not establish

21  *Monell* liability). Moreover, "the number of complaints filed, without more, indicates nothing.

22  People may file a complaint for many reasons," perhaps for reasons wholly unrelated to

23  Plaintiff's injury, "or for no reason at all." *See Strauss v. City of Chicago*, 760 F.2d 765, 768–69

24  (7th Cir. 1985). Instead, Plaintiff "need[s] to identify what made the use of force in other matters

25  illegal and show that a ***similar illegality was involved in [his] case***." *See Whiting v. City of San*

26  *Jose*, No. 21-CV-05248-VKD, 2022 WL 2714968, at *5 (N.D. Cal. July 13, 2022) (discussing the

27

28  [3] The Court assumes Plaintiff is trying to say that officers' belief that a person is holding a firearm is wrong half the time.

1    use of statistical evidence in the context of *Monell* liability) (emphasis added).

2        Second, as Defendants point out, Chief Hall became the head of the Fresno Police

3    Department in 2019—and Plaintiff has not explained his connection to two shootings that

4    occurred before 2019. (Doc. 25 at 4.) Though Chief Hall served for more than 40 years prior to

5    becoming the Chief of the Fresno Police Department, Plaintiff has not alleged in the FAC

6    whether Mr. Hall was in a position to reign in "rogue" officers prior to 2019.

7        Moreover, even though the incident involving Plaintiff occurred two years after Mr. Hall

8    became the head of the FPD, it does not suggest that Chief Hall was not trying to effectuate

9    change. Plaintiff has offered no "*specific* allegations" regarding Chief Hall's purported

10   "'*acquiescence* in' the unconstitutional conduct of his subordinates." *Hydrick*, 669 F.3d at 942

11   (quoting *Starr*, 652 F.3d at 1206–07)) (emphasis added). Accordingly, this Court **GRANTS**

12   Defendants' motion to dismiss with respect to the first cause of action with leave to amend.

13       **B.  Third Cause of Action: *Monell* Liability**

14       To establish municipal liability under § 1983, plaintiffs "must prove that 'action pursuant

15   to official municipal policy' caused their injury." *Connick v. Thompson*, 563 U.S. 51, 60 (2011)

16   (quoting *Monell*, 436 U.S. at 691). Official municipal policy includes "the decisions of a

17   government's lawmakers, the acts of its policymaking officials, and practices so persistent and

18   widespread as to practically have the force of law." *Id*. at 61 (citations omitted). "A municipality

19   may not, however, be sued under a respondeat superior theory. A plaintiff must therefore show

20   'deliberate action attributable to the municipality [that] directly caused a deprivation of federal

21   rights.'" *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 603 (9th Cir. 2019) (citations

22   omitted) (alteration in original).

23       "Allegations of *Monell* liability will be sufficient for purposes of Rule 12(b)(6) where

24   they: (1) identify the challenged policy/custom; (2) explain how the policy/custom is deficient;

25   (3) explain how the policy/custom caused the plaintiff harm; and (4) reflect how the

26   policy/custom amounted to deliberate indifference, i.e. show how the deficiency involved was

27   obvious and the constitutional injury was likely to occur." *Lucas v. City of Visalia*, No. 1:09-CV-

28   1015AWIDLB, 2010 WL 1444667, at *4 (E.D. Cal. Apr. 12, 2010) (citations omitted).

1    As an initial matter, the Court notes that "if individuals are being sued in their official

2    capacity as municipal officials *and* the municipal entity itself is also being sued, then the claims

3    against the individuals are duplicative and should be dismissed." *See Vance v. Cnty. of Santa*

4    *Clara*, 928 F. Supp. 993, 996 (N.D. Cal. 1996) (citing *Carnell v. Grimm*, 872 F. Supp. 746, 752

5    (D. Haw. 1994), *aff'd in part, appeal dismissed in part for want of jurisdiction*, 74 F.3d 977 (9th

6    Cir. 1996)) (emphasis in original). The FAC expressly states that third cause of action is grounded

7    in a theory of "*Municipal* Liability for Unconstitutional Custom or Policy." (Doc. 16 at 17.

8    (emphasis added).) As such, Plaintiff's "official capacity" claim against municipal officials (e.g.,

9    Chief Hall) is redundant given that Plaintiff also has named the City. Therefore, this warrants

10    dismissal of the *Monell* claim against Chief Hall.[4] *Solis v. City of Vallejo*, No. 2:14-cv-00483-

11    KJM-KJ, 2014 WL 2768847, at *5 (E.D. Cal. June 18, 2014) ("As an initial matter, the court

12    dismisses plaintiff's claim against Sheriff Ferrara as a municipal officer with prejudice because

13    plaintiff sues Sheriff Ferrara in his official capacity along with the County." (citation omitted)).

14    Accordingly, the Court **DISMISSES** the third cause of action with respect to Chief Hall and other

15    individual defendants **WITH PREJUDICE**.

16         1.  *Monell* Policy or Custom

17    To prove a claim for municipal liability based on a policy, custom, or practice, a plaintiff

18    must "demonstrate that an 'official policy, custom, or pattern' on the part of [the defendant] was

19    'the actionable cause of the claimed injury.'" *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143

20    (9th Cir. 2012) (quoting *Harper v. City of Los Angeles*, 533 F.3d 1010, 1022, 1026 (9th Cir.

21    2008)). "A policy or custom may be found either in an affirmative . . . policy or in the failure of

22    an official 'to take any remedial steps after [the constitutional] violations.'" *Gomez v. Vernon*,

23    255 F.3d 1118, 1127 (9th Cir. 2001) (quoting *Larez v. City of Los Angeles*, 946 F.2d 630, 647

24    (9th Cir. 1991). The former is sometimes called a policy of action, which occurs when "the

25    _____

26    [4] Plaintiff argues that the Ninth Circuit purportedly held in *Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty.*
*Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008), that an "official capacity claim against Sheriff of Los Angeles
County, while equivalent to a suit against the Sheriff's Department, is not equivalent to a suit against Los Angeles

27    County." (Doc. 24 at 18.) That is plainly false, for the L.A. County was not even a party to that case, and the cited
page made no such distinction. This Court finds no support in the case law for Plaintiff's assertion that "an official

28    capacity claim against the Chief of the FPD is not equivalent to a suit against the City of Fresno." (*See id.* (emphasis
removed).)

1    government body itself violates someone's constitutional rights, or instructs its employees to do

2    so[.]" *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014). The latter is sometimes called a

3    policy of inaction, which "is based on a government body's 'failure to implement procedural

4    safeguards to prevent constitutional violations.'" *Id.* (quoting *Tsao v. Desert Palace, Inc.*, 698

5    F.3d 1128, 1143 (9th Cir. 2012)).

6        In addition to proving the existence of a written policy, "a plaintiff may be able to prove

7    the existence of a widespread practice that, although not authorized by written law or express

8    municipal policy, is 'so permanent and well settled as to constitute a custom or usage with the

9    force of law.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality) (quoting

10   *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)). "Liability for improper custom,"

11   however, "may not be predicated on isolated or sporadic incidents; it must be founded upon

12   practices of sufficient duration, frequency and consistency that the conduct has become a

13   traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996)

14   (citations omitted), *holding modified by Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001). For

15   instance, "two vaguely described incidents are insufficient to support a claim for municipal

16   liability." *See Bagley v. City of Sunnyvale*, No. 16-cv-02250-JSC, 2017 WL 5068567, at *5 (N.D.

17   Cal. Nov. 3, 2017); *see also Wilkins v. City of Tempe*, No. CV 09-00752-PHX-MHM, 2010 WL

18   94116, at *1 (D. Ariz. Jan. 6, 2010) (finding insufficient evidence to infer a municipal policy or

19   practice of racial discrimination based on the filing of two lawsuits and forced retirement of one

20   police officer). In contrast, court have denied the motion to dismiss the *Monell* claim when a

21   plaintiff alleges eight specific instances of misconduct by jail guards. *See, e.g.*, *Nelson v. City of

22   Los Angeles*, No. CV 11-5407-PSG JPR, 2015 WL 1931714, at *10–11 (C.D. Cal. Apr. 28,

23   2015).

24       Defendants argue that the 2015 and 2017 shootings mentioned in the FAC do not show a

25   "policy or custom" for purposes of *Monell* liability. (Doc. 18 at 8.) The Court agrees with

26   Defendants that "two vaguely described incidents are insufficient to support a claim for municipal

27   liability." *See Bagley*, 2017 WL 5068567, at *5. Moreover, the Court finds that the 2015 and

28   2017 shootings are not analogous to the present incident. For instance, the FAC states at a high

1 level of generality that, in 2015, a Fresno Police Officer shot and killed a person "prior to

2 providing any warning or any attempt to utilize less lethal force." (Doc. 16 at ¶ 34.) These sparse

3 factual allegations do not demonstrate a sufficiently analogous situation as to the shooting of Mr.

4 Coronado. Rather, the FAC expressly states that Officers Dechow and Bishop shouted commands

5 at Plaintiff, including "something again about dropping his weapon[.]" (*Id*. at ¶ 20.) The same is

6 true as to the 2017 incident.  Mr. Coronado was neither running away nor did any officer say

7 anything like "good shot." (*See* Doc. 16 at ¶ 37.) Therefore, because FAC does not set forth

8 enough factual detail to demonstrate that the 2015 and 2017 incidents appear to be analogous or

9 "closely related" to the present incident, *cf*. *Canton*, 489 U.S. at 391, whatever FPD policy or

10 custom implicated by them did not cause—i.e., was not the "moving force" behind—the shooting

11 of Plaintiff Coronado, *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985); *Wright v. Cnty.*

12 *of San Bernardino*, No. 5:24-cv-01123-JLS-JC, 2025 WL 546362, at *4 (C.D. Cal. Jan. 14, 2025)

13 ("None of these examples are sufficiently similar (and close enough to the incident at issue) to

14 permit the inferences that the alleged policy/custom exists and was the "moving force" behind

15 Plaintiff's injuries.").

16        Plaintiff argues that paragraphs 79 to 81 of the FAC shows that he has sufficiently pled

17 the existence of a practice or custom. (Doc. 24 at 19–20.) Those cited paragraphs, however, lack

18 factual allegations and are, instead, conclusory. The FAC alleges, for instance, that the City has

19 "an unconstitutional policy, custom, and practice of detaining and arresting individuals without

20 probable cause or reasonable suspicion, and using excessive force, which also is demonstrated by

21 inadequate training regarding these subjects." (Doc. 16 at ¶ 79(g); *see also id*. at ¶ 79(h)

22 ("Condoning and encouraging [FPD's] officers in the belief that they can violate the rights of

23 persons such as Mr. Coronado with impunity, and that such conduct will not adversely affect their

24 opportunities for promotion and other employment benefits.").) Like *Warner*, Plaintiff's "*Monell*

25 claim consists of formulaic recitations of the existence of unlawful policies, customs, or habits.

26 Plaintiff[] do[es] not allege any specific facts giving rise to a plausible *Monell* claim." *See*

27 *Warner v. Cnty. of San Diego*, No. 10cv1057 BTM (BLM), 2011 WL 662993, at *4 (S.D. Cal.

28 Feb. 14, 2011).

1          Plaintiff further argues that none of the cases cited by Defendants "deal with pleadings

2    requirements or motions to dismiss." (Doc. 24 at 20.) That is incorrect. In *Warner*—a case cited

3    by Defendants—arose in the context of a motion to dismiss. Finally, Plaintiff argues that facts

4    showing "systemic" misbehavior of the City's police force can be found in Section IV.A of its

5    brief. (*Id.*) However, at issue here are factual allegations made in the FAC.

6          2.   Failure to Train

7          Under limited circumstances, "a local government's decision not to train certain

8    employees about their legal duty to avoid violating citizens' rights may rise to the level of an

9    official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61

10   (2011). To establish liability under this theory, the "municipality's failure to train its employees

11   in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom

12   the [untrained employees] come into contact.'" *Id*. (citing *City of Canton, Ohio v. Harris*, 489

13   U.S. 378, 388 (1989)). The deliberate indifference standard requires Plaintiff to prove "that 'the

14   need for more or different training is so obvious, and the inadequacy so likely to result in the

15   violation of constitutional rights, that the policymakers of the city can reasonably be said to have

16   been deliberately indifferent to the need.'" *Rodriguez*, 891 F.3d at 802 (quoting *Harris*, 489 U.S.

17   at 390). "Ordinarily, '[a] pattern of similar constitutional violations,' rather than proof of a single

18   incident, is 'necessary to demonstrate deliberate indifference.' Nonetheless, single-incident

19   liability may exist in the rare case where 'the unconstitutional consequences of failing to train' are

20   'patently obvious.'" *Perez v. City of Fresno*, 98 F.4th 919, 931 (9th Cir. 2024) (citations omitted).

21         Defendants first argue that "Plaintiff merely alleges that defendant officers were

22   inadequately trained, but "fails to allege sufficient facts to support a finding that the failure to

23   train amounted to [] 'deliberate indifference'" within the meaning of *Monell* liability. (Doc. 18 at

24   19.) In response, Plaintiff "*asserts* Defendants acted with deliberate indifference to the

25   foreseeable consequences" of Defendants' failure to train its officers, (*see* Doc. 24 at 21.

26   (emphasis added)), but the FAC offers to facts to support this assertion. For instance, Plaintiff

27   alleges, in a conclusory manner, that the City "knew or in the exercise of reasonable care should

28   have known" that Officers Dechow and Bishop had a "propensity for violence" and for using

1 | excessive force. (Doc. 16 at ¶ 79(c).) Such threadbare conclusory allegations have not been

2 | permitted since *Twombly* and *Iqbal*.

3 |       Second, regardless of whether Plaintiff is alleging a "pattern of similar constitutional

4 | violations" or pursuing "single-incident liability" theory, *Perez*, 98 F.4th at 931, Plaintiff needs to

5 | plead and prove that "policymakers are on actual or constructive notice that *a particular omission*

6 | in their training program causes city employees to violate citizens' constitutional rights."

7 | *Connick*, 563 U.S. at 61 (emphasis added). Plaintiff then needs to show that "the identified

8 | deficiency in [the] city's training program [is] closely related to [his constitutional] injury."

9 | *Canton*, 489 U.S. at 391.

10 |       As Defendants point out, (Doc. 18 at 19), however, Plaintiff has not offered little other

11 | than threadbare conclusory statements, stating that the City's hiring and training practices are

12 | inadequate. (*See, e.g.*, Doc. 16 at ¶ 79(b) ("Employing and retaining as police officers . . .

13 | [Defendants knew or] reasonably should have known had dangerous propensities for abusing

14 | their authority. . . ."); *Id*. at ¶ 79(c) ("Inadequately supervising, training . . . personnel, . . . whom

15 | Defendants . . . knew or in the exercise of reasonable care should have known had the . . .

16 | propensity for violence. . . .").) Plaintiff has not, for instance, explained what are the specific

17 | topics that the City is not teaching its police officers. Is it psychological discipline under stressful

18 | situations, de-escalation strategies, or firearm identification? Thus, like *Young v. City of Visalia*,

19 | "the complaint does not identify what the training and hiring practices were, how the training and

20 | hiring practices were deficient, or how the training and hiring practices caused Plaintiff['s] harm."

21 | 687 F. Supp. 2d 1141, 1149–50 (E.D. Cal. 2009) (citations omitted).

22 |       Accordingly, the Court finds that Plaintiff has failed to specifically identify the "particular

23 | omission" in the City's training program, nor has he shown how said omission is "closely related"

24 | to his injuries.

25 |       3.  <u>Ratification</u>

26 |       As Defendants correctly recognize, (*see* Doc. 18 at 20), to prevail on a theory of

27 | ratification, Plaintiff must plead and prove that Chief Hall came to the same conclusion and on

28 | the same grounds as officers under his command, for the Supreme Court's decision in

1   "*Praprotnik* requires that a policymaker approve a subordinate's decision *and the basis for it*

2   before the policymaker will be deemed to have ratified the subordinate's discretionary decision."

3   *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992) (per curiam) (citation omitted)

4   (emphasis in original).

5        Plaintiff, however, merely argues that Chief Hall has failed to "explicitly reject[] the

6   officers' wrongdoing" and/or "deflect[ed] from their violative behavior by assigning blame to the

7   Plaintiff or unrelated topics like homelessness and addiction." (Doc. 24 at 22.) Plaintiff fails to

8   allege how Chief Hall approved of "the basis for" his subordinate's decision. Put differently,

9   Plaintiff has not alleged how Chief Hall's "deflecti[on]" onto the topic of homelessness and

10  addiction relates to the reason(s) why Officers Dechow, Bishop, Nichols, and Graves used

11  excessive force.

12       The City's purported ratifications of the two prior shootings are also insufficient to

13  support a *Monell* claim. (*See, e.g.*, Doc. 24 at 20 (arguing that the FAC "provid[es] multiple

14  examples of use of deadly force against unarmed civilians, as well as facts supporting the

15  systematic impunity endorsed by the FPD and ratified by its highest officials[]"); *Id.* at 21

16  (arguing that Plaintiff has "explicitly identifie[d] several documented instances of the FPD's

17  deficient response" to the misconduct of its officers).) Notably, the FAC provides nothing but a

18  one-sentence description of the 2015 incident, followed by a ten-word-long sentence stating that

19  "[a]n investigation found the use of force to be justified." (*See* Doc. 16 at ¶ 34.) Such barebone

20  description does not provide this Court with any colorable basis to determine whether the FPD

21  had ratified "the basis for" its officers' decision to shoot Casillas, the victim of the 2015 shooting.

22  With respect to the 2017 shooting, the FAC states that the incident was investigated by the Fresno

23  Police Department's Internal Affairs Bureau, the Fresno County District Attorney's Office, and

24  the City of Fresno's Office of Independent Review, and they all "concluded that the use of lethal

25  force was justified." (Doc. 16 at ¶ 35 (quotation marks omitted).) Plaintiff has not explained why

26  Chief Hall's reliance on the unanimous judgment of three distinct investigations amounted to

27  "ratification" or otherwise rose to the level of reckless, "deliberate indifference," *see Peterson v.*

28  *City of Fort Worth, Tex.*, 588 F.3d 838, 848 (5th Cir. 2009) (finding no ratification of use of

1    excessive force where the Chief of Police determined after investigation that the officers

2    complied with department policies), especially since the District Attorney's finding is entitled to

3    the "presumption of regularity," *cf. Nieves v. Bartlett*, 587 U.S. 391, 400 (2019) (discussing the

4    presumption of prosecutorial regularity in the context of malicious prosecution). Rather, "[f]or

5    there to be ratification," Plaintiff must plead and prove "'something more' than a single failure to

6    discipline or the fact that a policymaker concluded that the defendant officer's actions were in

7    keeping with the applicable policies and procedures." *Kong Meng Xiong v. City of Merced*, No.

8    1:13-cv-00083-SKO, 2015 WL 4598861, at *29 (E.D. Cal. July 29, 2015) (citing *Kanae v.*

9    *Hodson*, 294 F.Supp.2d 1179, 1191 (D. Haw. 2003)); *see also Christie v. Iopa*, 176 F.3d 1231,

10   1239 (9th Cir. 1999) ("[I]t is well-settled that a policymaker's mere refusal to overrule a

11   subordinate's completed act does not constitute approval."); *Peterson v. City of Fort Worth, Tex.*,

12   588 F.3d 838, 848 (5th Cir. 2009) (no ratification of use of excessive force where the Chief of

13   Police determined after investigation that the officers complied with department policies);

14   *Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir. 1989) ("As we have indicated before, we cannot

15   hold the failure of a police department to discipline in a specific instance is an adequate basis for

16   municipal liability under *Monell*." ). Again, isolated incidents are not enough to support a theory

17   of ratification.

18        Moreover, as Defendants point out, (Doc. 25 at 4), Plaintiff is relying on new facts

19   introduced in Part IV.A of its brief, which are not in the FAC, (Doc. 24 at 20, 22); the Court

20   cannot consider them on a motion to dismiss. Relatedly, the Court declines to consider any

21   allegation without citation to the FAC. Plaintiff was obligated to direct the Court to the factual

22   allegations of the FAC that support his position. It is not for the Court to comb through the FAC

23   to try to find support for Plaintiff's assertions. In sum, Plaintiff has failed to show that the

24   incidents amounted to a municipal "policy;" "that this policy amount[ed] to deliberate

25   indifference to the plaintiff's constitutional right;" and that the policy is sufficiently analogous to

26   the incident involving Mr. Coronado as to have had caused the constitutional violation. *Plumeau*

27   *v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997) (internal quotation marks

28   and citation omitted).

1    For the foregoing reasons, this Court **GRANTS** Defendants' motion to dismiss the third

2  cause of action with leave to amend. *See AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631,

3  637 (9th Cir. 2012) (noting that leave to amend is appropriate because plausible facts supporting a

4  policy or custom can cure deficiencies in a *Monell* claim).

5    **C.  Second Cause of Action: Pre-Trial Detention**

6    The FAC states, under the second cause of action, that Plaintiff "has a right to *safe*

7  *conditions* of pretrial confinement under the Fourteenth Amendment to the United States

8  Constitution." (Doc. 16 at ¶ 65. (emphasis added).)

9    1.   Unsafe Conditions

10    The Court first considers the claim that was explicitly raised in the FAC—the unsafe

11  conditions claim. The Court agrees with Defendants, (Doc. 25 at 6), that the correct legal standard

12  for assessing Plaintiff's unsafe conditions claim is "objective deliberate indifference," under

13  which "the plaintiff must 'prove more than negligence but less than subjective intent—something

14  akin to reckless disregard[,]'" *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018)

15  (quoting *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)) (footnote omitted).

16    In *Mastromonaco*, the Southern District of New York addressed a situation where the

17  plaintiff complained "that he was 'chained' to the bed while at the Hospital." *Mastromonaco v.*

18  *Cnty. of Westchester*, No. 15 CV 10166 (VB), 2018 WL 4042111, at *9 (S.D.N.Y. Aug. 23,

19  2018), *aff'd*, 779 F. App'x 49 (2d Cir. 2019). The S.D.N.Y explained:

20
> In evaluating the reasonableness of handcuffing, a court considers:
21
> (i) whether the handcuffs were unreasonably tight; (ii) whether
> defendants ignored plaintiff's pleas that the handcuffs were too tight;
22
> and (iii) the degree of injury to the wrists. Here, there is no evidence
> to suggest plaintiff's handcuffs were too tight, he asked to have the
> handcuffs removed, or he was injured as a result of being handcuffed
23
> to the bed. Therefore, the use of handcuffs while plaintiff was at the
> Hospital does not amount to a constitutional violation.
24

25  *Id.* (internal citation omitted); *see also El Bey v. Russel*, No. 23-cv-00107-LB, 2023 WL 4332389,

26  at *6 (N.D. Cal. July 3, 2023) ("Overly tight handcuffs sometimes can establish a Fourth

27  Amendment violation, and sometimes they do not. Usually, viable claims involve extremely tight

28  cuffs and resulting injury. The plaintiff needs to describe more specifically what happened when

1    he was handcuffed." (internal citations omitted)); *Saddozai v. San Francisco Gen. Hosp. Med.*

2    *Ctr.*, No. 18-04492 BLF (PR), 2019 WL 3082944, at *2 (N.D. Cal. July 11, 2019) (holding that

3    Plaintiff has plausibly alleged an excessive force claim in light of the fact that officers applied

4    "excessively tight shackles and handcuffs that were applied continuously for four days," and that

5    officers "allegedly punched Plaintiff in the face 'without reason[]'" (citation omitted)), *aff'd sub*

6    *nom. Saddozai v. Nelson*, No. 20-16803, 2022 WL 501580 (9th Cir. Feb. 18, 2022).

7         Here, Plaintiff alleges that he "was handcuffed to the hospital bed rail by his left wrist,

8    despite not having been charged with any crime and being severely injured," (Doc. 16 at ¶ 29);

9    that he was questioned while he was chained to the hospital bed, (*id.*); and that he was not

10   charged with any offense until the following evening. (*Id.* at ¶ 31.) He has not, however, alleged

11   that handcuffing him to a hospital bed had, in fact, caused *additional* injury to him, nor has he

12   alleged that he complained about the handcuff to unnamed officers at the hospital. Plaintiff

13   merely alleges that handcuffing him to his hospital "*potentially* interfer[ed] with his recovery,"

14   not that it actually did. (Doc. 24 at 16 (emphasis added).) Plaintiff has not plausibly

15   alleged/explained how police questioning was "inhumane" or "unsafe."[5] (*See* Doc. 24 at 15–16.)

16        The fact that Plaintiff was not charged for 40 hours, (Doc. 24 at 16), does not appear to

17   address whether he was confined in an unsafe or inhumane manner. Likewise, it does not appear

18   that the delay ran afoul of the Constitution. As a general rule, the Fourth Amendment requires

19   that judicial determinations of probable cause to be made within 48 hours of arrest or seizure. *See*

20   *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991). While an arrestee or detainee may have

21   a due process right to be released within a reasonable time after the reason for his detention has

22   ended, the Fourth and Fourteenth Amendments may permit a "reasonable postponement" of—or

23   delay in—a person's release. *See Brass v. Cnty. of Los Angeles*, 328 F.3d 1192, 1200–01 (9th Cir.

24   2003) (quoting *McLaughlin*, 500 U.S. at 48)). Thus, Plaintiff has failed to plausibly allege or

25   explain that his 40-hour-long confinement arose to an actionable constitutional violation.

26

27   [5] "Claims by pretrial detainees are analyzed under the Fourteenth Amendment Due Process Clause, rather than under
     the Eighth Amendment. Because pretrial detainees' rights under the Fourteenth Amendment are comparable to
28   prisoners' rights under the Eighth Amendment, however, [courts] apply the same standards." *Frost v. Agnos*, 152
     F.3d 1124, 1128 (9th Cir. 1998) (citations omitted).

1          2.   Non-Punitive Purpose

2          To prevail on his Fourteenth Amendment claim, Plaintiff must establish that the

3   restrictions imposed by his confinement constituted punishment rather than a legitimate

4   governmental purpose. *Bell v. Wolfish*, 441 U.S. 520, 539 (1979). To constitute impermissible

5   punishment, Plaintiff must plead and prove that (a) the harm or disability caused by the

6   government's action must significantly exceed, or be independent of, the inherent discomforts of

7   confinement, *Bell*, 441 U.S. at 537, and (b) that the particular restriction/condition is not

8   reasonably related to a legitimate, non-punitive government objective, *Demery v. Arpaio*, 378

9   F.3d 1020, 1028–30 (9th Cir. 2004).

10         Plaintiff's claim of unnecessary handcuffing does not rise to the level of a harm or

11  disability condemned by the Constitution. *See Bell*, 441 U.S. at 539 n.21 ("There is, of course, a

12  de minimis level of imposition with which the Constitution is not concerned."). As Defendants

13  point out, (Doc. 24 at 25 at 7), Plaintiff has not explained how handcuffing him to his hospital bed

14  injured him.[6] Indeed, Plaintiff alleges that handcuffing him to his hospital "***potentially***

15  interfer[ed] with his recovery," not that it actually did. (Doc. 24 at 16 (emphasis added.) "[T]he

16  detainee's understandable desire to live as comfortably as possible and with as little restraint as

17  possible during confinement does not convert the conditions or restrictions of detention into

18  'punishment.'" *See Bell*, 441 U.S. at 537. Rather, Plaintiff must plausibly allege sufficient facts

19  showing how handcuffing him to his hospital bed caused "objectively serious" harms, *Sain v.

20  Wood*, 512 F.3d 886, 889 (7th Cir. 2008), and caused injuries that significantly exceed the

21  "inherent discomforts of confinement," *Demery*, 378 F.3d at 1030. As currently plead, his

22  conclusory allegation that handcuffing him to his hospital bed was both "inhumane" and

23  unjustifiably punitive, (Doc. 24 at 16–17), fail to state a claim.

24         Plaintiff also complains "that there was no reasonable penological need for . . . keeping

25  him under surveillance[] and subjecting him to questioning" without support from his family,

26

---

27  [6] "Claims by pretrial detainees are analyzed under the Fourteenth Amendment Due Process Clause, rather than under
    the Eighth Amendment. Because pretrial detainees' rights under the Fourteenth Amendment are comparable to

28  prisoners' rights under the Eighth Amendment, however, [courts] apply the same standards." *Frost v. Agnos*, 152
    F.3d 1124, 1128 (9th Cir. 1998) (citations omitted).

1    especially considering that "Plaintiff was ultimately charged with a mere misdemeanor," not a

2    "serious crime;" as such, the conditions of his confinement was punitive in nature. (Doc. 24 at 16

3    (citation to the record omitted).) The Court disagrees. First, Plaintiff has not plausibly alleged that

4    he was harmed or injured due to any surveillance or questioning. Second, Plaintiff's allegations

5    fail to plausibly suggest that the government's action—questioning an individual who was shot by

6    an officer—was not reasonably related to a legitimate, non-punitive government objective. Third,

7    Plaintiff has cited no authority for his position that familial visitation for a pre-arraignment

8    detainee within 48 hours of detention is a relevant factor that this Court needs to consider. Fourth,

9    the fact that "Plaintiff was *ultimately charged* with a mere misdemeanor" does not directly speak

10   to the question of whether police officers had legitimate reasons to handcuff Plaintiff to his

11   hospital bed for the first 40 hours *immediately after a shooting*, before all the facts are known.

12          The Court also notes that Plaintiff is challenging, under the second cause of action, the

13   conditions of his confinement at the hospital, yet the FAC clearly states that Plaintiff was not

14   charged with, or cited for, any crime or misdemeanor when he left the hospital. (Doc. 16 at ¶ 31.)

15   It is the Fourth Amendment, rather than the Fourteenth Amendment, that governs claims asserted

16   by an arrestee who is detained without a warrant up to the time the arrestee is arraigned or

17   released. *Pierce v. Multnomah Cnty., Or.*, 76 F.3d 1032, 1043 (9th Cir. 1996) ("We hold,

18   therefore, that the Fourth Amendment sets the applicable constitutional limitations on the

19   treatment of an arrestee detained without a warrant up until the time such arrestee is released or

20   found to be legally in custody based upon probable cause for arrest."). Put another way, it appears

21   that Plaintiff must pursue a theory of liability based on his Fourth Amendment right to be free

22   from unreasonable seizure,[7] not a Fourteenth Amendment claim based on pretrial conditions of

23   confinement. Accordingly, the Court **DISMISSES** the second cause of action **WITH LEAVE**

24   **TO AMEND** consistent with the above instructions.

25
26   [7] The Fourth Amendment requires police officers making an arrest or seizure to use only an amount of force that is
     objectively reasonable in light of the circumstances facing them. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The
     answer to this question calls for a balance test that weighs "the nature and quality of the intrusion on the individual's
27   Fourth Amendment interests against the countervailing government interests at stake." *Id*. at 396 (internal quotation
     marks omitted). As noted above, Plaintiff has not alleged that the handcuffs or restraints were applied too tightly.
28   Rather, Plaintiff is apparently objecting that he was required to wear handcuffs and restraints at all. Absent more
     factual allegations, however, the Court struggles to see a colorable Fourth Amendment claim.

1  **CONCLUSION**

2  Based upon the foregoing, the Court **ORDERS**:

3  (1) Defendant's Motion to Dismiss (Doc. 16) is **GRANTED IN PART**.

4  (2) Plaintiff's first cause of action is **DISMISSED** with respect to Chief Hall **with 21**

5  **days leave to amend**.

6  (3) Plaintiff's second cause of action is **DISMISSED** with **PREJUDICE**.

7  (4) Plaintiff's third cause of action is **DISMISSED** with respect to the City of Fresno

8  **with 21 days leave to amend**.

9  (5) Plaintiff's third cause of action is **DISMISSED** with respect to all other defendants

10  with **PREJUDICE**.

11  Failure to amend the FAC will result in the action proceeding only on the causes of action and as

12  to the defendants not dismissed in this order.

13

14  IT IS SO ORDERED.

15  Dated:   **October 24, 2025**

UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28

18